**Doyle V. COTTAM, Plaintiff,**

**v.**

**Glenn W. HEPPNER and Bank of Iron County, Defendants.**

**Glenn W. HEPPNER, Irvin Heppner, Riverdale Water Company, a corporation, Plaintiffs and Appellants,**

**v.**

**BANK OF IRON COUNTY, a Utah corporation, and Doyle Cottam, individually, Defendants and Appellees.**

**No. 20382.**

Supreme Court of Utah.

July 7, 1989.

Willard R. Bishop, D. Williams Ronnow, Cedar City, for plaintiffs and appellants.

Ken Chamberlain, Richard K. Chamberlain, Richfield, for defendants and appellees.

ZIMMERMAN, Justice:

Plaintiffs Glenn W. Heppner, Irvin Heppner, and the Riverdale Water Company (hereinafter collectively referred to as "the Heppners") appeal from a judgment entered after a jury trial that awarded the bank a deficiency judgment for the difference between the amount due on a note executed by the Heppners and the amount realized from the sale of the collateral securing the note—a herd of cattle. The Heppners contend that in selling the cattle, the bank did not give the required notice and did not dispose of the collateral in a commercially reasonable manner, all as required by section 70A–9–504(3) of the Utah Code ("Utah UCC"). Therefore, the Heppners argue, the bank was not entitled to a deficiency judgment. The Heppners also claim that in repossessing the cattle, the bank, assisted by Cottam, committed a breach of the peace that entitled the Heppners to damages and that the trial court improperly instructed the jury on this issue. They contend that, applying the proper standard, the jury would have to have found for them. We reject these arguments, find no occasion to reach the remaining contentions, and affirm the judgment entered below.

The Heppners engaged in a cattle operation in Garfield County, Utah. In February of 1981, Glenn Heppner purchased cattle from Cottam for $105,000. Cottam took back a note for $38,000 of the purchase price. This note was secured by 153 head of cattle, any calves born to those cattle while in the Heppners' possession, and the funds in two escrow accounts. The $67,000 balance of the purchase price was paid to Cottam in cash out of the proceeds of a $180,000 loan the Heppners secured from the bank in March of 1981. The remaining $113,000 from the bank loan went to pay other existing obligations of the Heppners and to purchase additional cattle. The bank loan was secured by 364 head of cattle (including those securing the Cottam loan), Bureau of Land Management ("BLM") grazing rights permits, and certain properties and real estate located in California, including the assets of the Riverdale Water Company.

In August and September of 1981, the Heppners sold 112 head of cattle from the herd securing the notes. These cattle were

sold at public auctions in Cedar City and Delta, Utah, without the knowledge of the secured parties and in violation of the security agreements. Although the Heppners made several relatively small payments on the note to the bank, that note went into default on November 15, 1981. Between then and the time the bank repossessed the cattle in 1983, the Heppners were never able to bring the interest current, much less pay on the outstanding principal. Also during this period, the Heppners made no principal or interest payments on the $38,000 note they had given to Cottam.

In January of 1982, the bank approached the Heppners and threatened to repossess the cattle pursuant to the terms of its security agreement; however, the bank was instead persuaded to continue to work with the Heppners. In fact, the bank advanced the Heppners additional funds in the fall of 1982 to pay for the BLM grazing permits necessary to feed the cattle during the coming year. The bank cooperated with the Heppners because it was told that the sale of certain properties owned by the Heppners in California, including the Riverdale Water Company, was imminent and that the proceeds would be applied to the loan balance.

In April of 1983, Glenn Heppner, the bank, Cottam, and an additional interested party agreed to several steps designed to restructure and pay down the outstanding loan. The Heppners' herd was to be gathered from the winter range and culled. Apparently, the culled cattle were to be sold and the proceeds applied to the Heppners' loan and to balances due certain other creditors. The bank would then rewrite the original loan, rolling into the new principal amount of that loan all principal and interest still unpaid. The rewritten loan would carry a reduced rate of interest reflecting the decline in the prime rate since 1981. The cattle not sold would be the base upon which the Heppners would rebuild their herd. Pursuant to this discussion, the Heppner cattle began to be gathered into corrals owned by Cottam. Cottam allowed the cattle to be held in his corrals in accordance with a loose arrangement with the Heppners under which they agreed to buy Cottam three corral gates in exchange for the use of the corrals; the Heppners never provided the gates.

On the 12th and 13th of May, when most of the cattle had been brought in from their winter range, an officer of the bank traveled to California to check on the progress of the sale of the California properties, the proceeds of which were expected to reduce the amount outstanding on the loan. The officer discovered that one of the key properties, the Riverdale Water Company, was in receivership and near bankruptcy. He also found that the for-sale sign had been removed from another important piece of real estate. These discoveries were inconsistent with what bank had been told by the Heppners and prompted the bank to inform the Heppners that it was immediately calling the loan and taking possession of the cattle as collateral. With Cottam's permission, the bank took immediate possession of the Heppner cattle in Cottam's corrals and gathered the remaining cattle from the range. All were put in pens and sold by the bank through the Cedar City Livestock Auction at five separate sales held during the period from May 19th to July 21st of 1983. The bank realized a total of $92,359.44 from the five sales.

Cottam brought an action against the Heppners and the bank for the amounts due on the Heppners' $38,000 note that was in default. Cottam's claim against the bank was based on the assertion that he had a secured position superior to the bank's in some of the cattle seized and sold at the auction.

In response, the Heppners brought suit against the bank and Cottam, alleging breach of the peace, wrongful conversion of their property, and failure to conduct the disposition of the collateral in the manner required by section 9–504(3) of the Utah UCC. Utah Code Ann. § 70A–9–504(3) (1980). Specifically, section 70A–9–504(3) requires that "every aspect" of the disposition of collateral, "including method, manner, time, place and terms must be commercially reasonable." It also requires:

Unless collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, reasonable notification of the time and place of any public sale or reasonable notification of the time after which any private sale or other intended disposition is to be made shall be sent by the secured party to the debtor.

*Id.* The Heppners claimed that the bank neither gave the required notice nor handled the disposition in a commercially reasonable manner. As a result, the Heppners claimed that they were entitled to damages from the bank.[1]

The bank counterclaimed, seeking a deficiency judgment for the difference between the amount due under its note from the Heppners and the proceeds of the sale of the cattle. The bank based this claim on section 9-504(2) of the Utah UCC. Section 70A-9-504(2) provides: "If the security interest secures an indebtedness, the secured party must account to the debtor for any surplus, and, unless otherwise agreed, the debtor is liable for any deficiency." Utah Code Ann. § 70A-9-504(2) (1980).

All of the above actions were consolidated. After consolidation, the bank and Cottam settled their priority dispute. Under the terms of the settlement, Cottam dismissed his claim against the bank and assigned to the bank all his claims against the Heppners.

At trial, the Heppners relied upon the alleged violation of section 70A-9-504(3) not only to support their claim for damages, but also as a basis for a defense to the bank's claim, contending that the failure to comply with the statute absolutely barred any deficiency judgment. The matter was submitted to the jury on special verdicts. The jury found that the Heppners were in default on their loan to the bank (including the Heppners' note to

Cottam that had been assigned to the bank) and that the cattle had been repossessed without breaching the peace. The jury rejected the Heppners' claim that the bank violated the Utah UCC. It found that the bank was excused from giving the Heppners notice of the sale by the provisions in section 70A-9-504(3) that waive notice if the collateral is of a type apt to decline speedily in value or is customarily sold on a recognized market. The jury found that both terms applied to the cattle disposed of at the auction. The jury also found that the disposition of the cattle was handled in a commercially reasonable manner. On the basis of these special verdicts, the trial court concluded that the bank was entitled to a deficiency judgment and awarded it $264,260.17, which included attorney fees provided for in the loan agreement. The court also authorized the bank to move against all remaining secured collateral.

On appeal, the Heppners do not contest the finding that they had defaulted on their obligations to the bank. However, they do challenge both the factual findings of the jury and the legal conclusions of the trial court. In the latter category are challenges to certain jury instructions and to determinations of the legal consequences of the jury's factual findings.

To successfully challenge the jury's factual findings, the Heppners must "marshal all the evidence in support of the [jury's] findings and then demonstrate that even viewing it in the light most favorable to the court below, the evidence is insufficient to support the findings." *Scharf v. BMG Corp.*, 700 P.2d 1068, 1070 (Utah 1985); *see In re Estate of Bartell*, 776 P.2d 885, 885–886 (Utah 1988). As for the trial court's statements or conclusions of law, they are accorded no similar deference; we review them under a correctness standard. *Scharf v. BMG Corp.*, 700 P.2d at 1070;

---

1. The Heppners apparently based their damage claims on section 70A-9-507(1) of the Utah Code ("Utah UCC"). Section 70A-9-507(1) provides that if a secured party fails to comply with the provisions of part five of chapter nine of the Utah UCC, the debtor "has a right to recover from the secured party any loss caused by a failure to comply with the provisions of this part." Utah Code Ann. § 70A-9-507(1). Part five of chapter nine contains both the Utah UCC's prohibition on self-help repossessions that involved a breach of the peace and the requirements that creditors provide debtors with notice and dispose of collateral in a commercially reasonable manner. Utah Code Ann. §§ 70A-9-503, -504(3) (1980).

*Kimball v. Campbell,* 699 P.2d 714, 716 (Utah 1985).

The Heppners first challenge the jury's finding that the bank repossessed the collateral without committing a breach of the peace. The Heppners contend that the court improperly instructed the jury as to what constitutes a "breach of the peace" and that if the proper legal standard is applied, the evidence will not support the jury's finding that no such breach occurred.

Section 9–503 of the Utah UCC authorizes self-help repossessions if they can be accomplished without a "breach of the peace." Utah Code Ann. § 70A–9–503 (1980). By negative implication, it prohibits repossessions that involve a breach of the peace. The Utah UCC does not, however, define "breach of the peace." The Heppners contend that a trespass constitutes a breach of the peace and that the bank trespassed when it entered corrals that the Heppners had rented from Cottam. The bank, on the other hand, contends that a mere trespass that does not present a threat of violence is not a breach of the peace within the meaning of the Utah UCC.

Courts have struggled in determining when a creditor's trespass onto a debtor's property rises to the level of a breach of the peace. The two primary factors considered in making this determination are the potential for immediate violence and the nature of the premises intruded upon. *See, e.g., Oaklawn Bank v. Baldwin,* 289 Ark. 79, 709 S.W.2d 91 (1986); *Census Fed. Credit Union v. Wann,* 403 N.E.2d 348 (Ind.Ct.App.1980); *Bloomquist v. First Nat'l Bank,* 378 N.W.2d 81 (Minn.Ct.App. 1985). In Utah, we have not passed on the issue, and the present case does not require that we do so because the Heppners could not prevail under any view. The actions of the bank do not even constitute a bare trespass, much less one in which there was a threat of violence. Therefore, any instructional error was harmless. *See, e.g., In re Estate of Kesler,* 702 P.2d 86, 96–97 (Utah 1985); *State v. Knight,* 734 P.2d 913, 918–20 (Utah 1987).

The evidence at trial was that Cottam entered the corrals and, with assistance from bank personnel, removed the penned cattle. Cottam gave the Heppners permission to use the corrals, both as a friendly gesture and in the hope that when the culls were sold, he would receive payment on the past-due note he held from the Heppners. It is true that Glenn Heppner testified that he had told Cottam he would buy him three new corral gates in exchange for the use of the corrals, something he failed to do. However, this bit of evidence would hardly support a finding that a lease had been entered into by the parties under which the Heppners had exclusive use of the corrals. In the absence of such an agreement, Cottam was fully entitled to enter the corrals. Therefore, neither he nor his invitee, the bank, committed a trespass in repossessing the cattle. *See K.B. Oil Co. v. Ford Motor Credit Co.,* 811 F.2d 310 (6th Cir.1987); *Wirth v. Heavey,* 508 S.W.2d 263 (Mo.Ct.App. 1974).

Not only was there insufficient evidence to support a finding that a trespass occurred when the corrals were entered, but there was also insufficient evidence to support a finding that a breach of the peace was likely to occur. The repossession occurred when neither the Heppners nor their agents were present, and neither the Heppners nor their agents contested the actual repossession as it took place. Although in an earlier telephone conversation Glenn Heppner had voiced displeasure with the proposed repossession, section 9–503 contemplates that self-help repossessions will take place without the debtor's consent. *See, e.g., Census Fed. Credit Union v. Wann,* 403 N.E.2d 348 (Ind.Ct.App. 1980); *Wade v. Ford Motor Credit Co.,* 8 Kan.App.2d 737, 668 P.2d 183 (1983). Therefore, Heppner's telephoned displeasure alone cannot be enough to create a likelihood of a breach of the peace.

The foregoing demonstrates that even if the Heppners are correct as to what constitutes a "breach of the peace" under section 9–503 of the UCC, a question we do not decide, the evidence is insufficient to support a finding that such a breach occurred

here. Therefore, any error in the instruction was harmless, and the jury's rejection of the Heppners' trespass claim must be affirmed. *See In re Estate of Kesler,* 702 P.2d at 96–97.

The Heppners next argue that the jury erred in rejecting their claim of a complete defense to the deficiency judgment sought by the bank under section 70A–9–504(2). This defense was grounded on the assertion that the bank did not give notice of the sale of the collateral, as required by section 70A–9–504(3), and/or that the disposition of the collateral was not done in a commercially reasonable manner, as is required by 70A–9–504(3). As noted earlier, the jury rejected the Heppners' claim, finding that the cattle threatened to decline speedily in value and that they were sold on a recognized market (the finding of either of which exempts the transaction from the notice requirement under section 70A–9–504(3)) and that the sale of the cattle was handled in a commercially reasonable manner. We first consider the Heppners' claim that, contrary to the jury's determination, the cattle were not sold on a recognized market.

■ The "recognized market" exception was included in the statute because of the presumption that collateral sold on such a market would be guaranteed to bring a fair price even though no notice of the sale was given the debtor. *See* W. Hawkland, *Uniform Commercial Code Series* § 9–504:07 (Callaghan 1986). A "recognized market" is one in which neutral market forces determine the price, as opposed to competitive bidding, and where the prices paid in actual sales of comparable property are currently available by quotation. Examples include the New York Stock Exchange and bond and commodity markets. *See* J. White & R. Summers, *Uniform Commercial Code* § 26–10 (2d ed.1980); *Norton v. Nat'l Bank of Commerce,* 240 Ark. 143, 398 S.W.2d 538 (1966). Although some courts

have found a livestock auction not to be a recognized market,[2] more recent cases have found a livestock auction to be a recognized market for the purposes of the statute.[3] We agree with the latter cases and hold that a livestock auction can be a "recognized market" if the appropriate circumstances are present. Under the facts of this case, we conclude that those circumstances were present, or so the jury could find on the evidence. Therefore, we decline to overturn the jury's special verdict that the auction at which the cattle were sold in this case was a "recognized market" for the purposes of section 9–504(3) of the Utah UCC. This being the case, notice was not required under section 70A–9–504(3). Because the exceptions to the requirement of notice read in the alternative, i.e., the collateral is either of a type customarily sold on a recognized market or perishable or threatens to decline speedily in value, we need not consider whether the cattle were perishable or threatened to decline speedily in value.

■ We next consider the Heppners' challenge to the finding that the sale was conducted in a commercially reasonable manner. We conclude that, taken as a whole, the evidence is sufficient to support the jury finding that the disposition of collateral was handled in all its aspects in a commercially reasonable manner. The public auctions at which the cattle were sold were well advertised, there was enthusiastic bidding at the auctions, and the cattle brought good prices. The auctions had available information about cattle prices in all the major markets. The cattle were carefully grouped and sold by the head rather than by the pound in order to promote bidding and obtain the best prices. Prior to the sale of the specialty cattle, the auctioneer made 15 to 20 phone calls to parties who may have had an interest in such cattle, and most of those contacted

2. *Wippert v. Blackfeet Tribe,* 215 Mont. 85, 87–90, 695 P.2d 461, 463–64 (1985); *State Bank of Towner v. Hansen,* 302 N.W.2d 760, 765 (N.D. 1981) (livestock not sold on markets where price is fixed at any given moment and free from competitive bidding).

3. *E.g., First Nat'l Bank v. Kehn Ranch, Inc.,* 394 N.W.2d 709, 714–15 (S.D.1986) (declining to follow *Wippert* and *Towner,* holding that cattle are traded on commodity futures markets similar to grain and other commodities and prices are available by quotation on a daily basis).

attended that auction. The specialty cattle could not reasonably have been sold for more. There was also evidence that the Heppners had chosen to use the same auction when they sold some cattle from the herd in violation of their security agreements.

Concluding, as we do, that the lack of written notice afforded the Heppners was not in violation of section 70A–9–504(3) and that the sale was conducted in a commercially reasonable manner, we need not consider the Heppners' premise that the bank's failure to comply with the notice requirements under section 70A–9–504(3) would result in the complete loss of entitlement to a deficiency judgment under 70A–9–504(2).[4]

The bank was entitled to seek a deficiency judgment measured by the difference between the amount realized from the auction and the outstanding indebtedness. This was the measure actually applied by the trial court. We, therefore, affirm the deficiency judgment.

We need not reach the remaining contentions.

The decision of the trial court is affirmed.

HALL, C.J., HOWE, Associate C.J., and STEWART and DURHAM, JJ., concur.

---

**4.** The consequences of a creditor's failure to comply fully with the requirements of section 70A–9–504(3) in disposing of collateral have not been definitively settled in Utah. There are generally three divergent lines of thought among the various states as to what the rule should be. These approaches are characterized as the "absolute bar" approach, the "setoff" approach, and the "rebuttable presumption" approach. Courts taking the absolute bar approach have concluded that any failure of a creditor to conform with either the notice or the commercial reasonableness requirements of section 9–504(3) absolutely bars the creditor from obtaining a deficiency judgment. *See, e.g., Atlas Thrift Co. v. Horan,* 27 Cal.App.3d 999, 104 Cal. Rptr. 315 (1972); *Randolph v. Franklin Inv. Co.,* 398 A.2d 340 (D.C.1979); *Camden Nat'l Bank v. St. Clair,* 309 A.2d 329 (Me.1973). Under the setoff approach, a creditor's failure to comply with the notice or commercial reasonableness requirements of section 9–504(3) does not result in any impairment of its ability to obtain a deficiency judgment; however, that judgment may be reduced by any offsetting damages the counterclaiming debtor is able to prove resulted from the creditor's failure to comply with the section's requirements. *See, e.g., Valley Mining Corp. v. Metro Bank,* 383 So.2d 158, 163–65 (Ala.1980); *Chapman v. Field,* 124 Ariz. 100, 602 P.2d 481, 485 (1979) (en banc); *Beneficial Fin. Co. v. Young,* 612 P.2d 1357, 1359 (Okla.1980). Finally, those following the rebuttable presumption approach, which appears to be the emerging majority, reason that failure of a creditor to comply with section 9–504(3) raises a rebuttable presumption that the value of the collateral is equal to the outstanding debt. This presumption can be rebutted by proof of the actual market value of the collateral with the creditor being entitled to a deficiency measured by the amount by which the indebtedness exceeds the proven market value. *See, e.g., Connecticut Bank and Trust Co. v. Incendy,* 207 Conn. 15, 540 A.2d 32 (1988); *Landmark First Nat'l Bank v. Gepetto's Tale O' The Whale,* 498 So.2d 920 (Fla.1986); *Emmons v. Burkett,* 256 Ga. 855, 353 S.E.2d 908 (1987); *First Galesburg Nat'l Bank & Trust Co. v. Joannides,* 103 Ill.2d 294, 82 Ill.Dec. 646, 469 N.E.2d 180 (1984). *See generally* Note, *The Consequences of Commercially Unreasonable Dispositions of Collateral: Haggis Mgt., Inc. v. Turtle Mgt., Inc.,* 1986 Utah L.Rev. 813, 816–22.

Although this Court has addressed the question of the availability of deficiency judgments for secured creditors in several cases, it has never surveyed the available options and made a reasoned choice from among the alternatives. As a result, at various times we appear to have taken each of the three approaches. *See Haggis Mgt., Inc. v. Turtle Mgt., Inc.,* 745 P.2d 442 (Utah 1985); *Scharf v. BMG Corp.,* 700 P.2d 1068 (Utah 1985); *Pioneer Dodge Center v. Glaubensklee,* 649 P.2d 28 (Utah 1982); *Utah Bank & Trust v. Quinn,* 622 P.2d 793 (Utah 1980); *FMA Fin. Corp. v. Pro–Printers,* 590 P.2d 803 (Utah 1979); *Zion's First Nat'l Bank v. Hurst,* 570 P.2d 1031 (Utah 1977). It is not clear, therefore, that had we found noncompliance with section 9–504(3) of the Utah UCC, the bank would have been precluded from recovering any deficiency. This is a question that remains open in Utah.