**In re Mathew J. KELAIDIS and Christine Kelaidis, Debtors.**

**Mathew J. Kelaidis and Christine Kelaidis, Plaintiffs–Appellees,**

v.

**Community First National Bank, formerly known as Guardian State Bank, Defendant–Appellant.**

BAP No. UT–01–037.
Bankruptcy No. 00–22223.
Adversary No. 00–2189.

United States Bankruptcy Appellate Panel of the Tenth Circuit.

April 19, 2002.

Brett P. Johnson, Snell & Wilmer, Salt Lake City, UT, for Plaintiffs–Appellees.

Stephen B. Mitchell, Burbidge & Mitchell, Salt Lake City, UT, for Defendant–Appellant.

Before PUSATERI, BOHANON, and MICHAEL, Bankruptcy Judges.

## OPINION

PUSATERI, Bankruptcy Judge.

Defendant Community First National Bank ("Community") appeals the bankruptcy court's judgment disallowing its claim against the chapter 13 debtors ("the Debtors") based on their guaranties and barring it from foreclosing on two houses they own. For the reasons stated below, we affirm.

**Background**

In 1996, the Debtors were principals of Dad's Inc. ("Dad's"). Community financed most of Dad's purchase of a restaurant, including both real property and the furniture, fixtures, and equipment located on it. The loan was secured by a trust deed on the real property and a security interest in the personal property. In addition, the Debtors guaranteed the loan and further secured it with trust deeds on two houses

they owned. The guaranties the Debtors signed contained language purporting to give Community broad powers to deal with the Dad's debt and the collateral, and to waive essentially any rights the Debtors could waive. A third party held a junior deed of trust on Dad's real property. After the purchase, Dad's installed several more items of equipment that also served, along with the furniture, fixtures, and equipment already in the restaurant, as collateral ("the Personal Property") for Community's loan.

In 1999, Dad's defaulted, and Community commenced non-judicial foreclosure on Dad's real property and the Debtors' two houses. Dad's filed a chapter 11 bankruptcy, but the junior lien holder obtained stay relief and foreclosed on Dad's real property, subject to Community's lien. A short time later, Dad's bankruptcy case was converted to chapter 7. Dad's was evicted from the real property, and the keys to the restaurant were delivered to the chapter 7 trustee. Later, Community foreclosed and bought the real property by a credit bid (apparently eliminating the junior lien holder's interest at that time).

A few months later, Community obtained an appraisal of Dad's Personal Property and also noticed the Debtors' houses for sale under the trust deeds. The Debtors filed a chapter 13 bankruptcy proceeding, staying the sale of the houses.

Shortly after foreclosing on Dad's real property, Community listed it for sale with two realtors. Potential buyers were told that a purchase of the Personal Property would either have to be negotiated separately with or approved by the chapter 7 trustee for Dad's bankruptcy estate. The realtors were not entitled to any commission for selling the Personal Property. For five or six months, Community and its realtors could gain access to the restaurant only by borrowing the keys from the chapter 7 trustee. Community's only effort to sell the Personal Property was by listing it in connection with the real property, so a potential buyer could have learned it was for sale only by asking about the real property.

A number of appraisals of the Personal Property were made at various times. Before Community made the Dad's loan in 1996, an appraiser valued the restaurant's then-existing personal property at $70,000, and as indicated, Dad's later added more items to the restaurant that are part of the Personal Property. In March 1999, at Dad's request, an appraiser valued the Personal Property at $105,000.

In January 2000, Community obtained an appraisal by Tom Erkelens that valued Dad's personal property at $25,000 in place, and $7,700 if removed and auctioned. Erkelens, however, was not given a list of the Personal Property that Community wanted to have appraised, and he omitted a number of items from his appraisal that were a part of the Personal Property. These items included a nine-foot back counter bar with two storage doors and refrigerator, an eleven-foot order counter with tile top, a plate chiller, an eight-foot stainless steel makeup counter with two food warmers, a floor safe, a U.S. Range conventional oven with grill, a ten-foot stainless steel ticket slide, fifteen feet of stainless steel shelving, a hood exhaust system, six oak chandeliers, an ice machine, a stainless steel steam kettle oven, a 600 gallon hot water heater, 77 brass railings and 77 etched glass pieces. Erkelens testified that he did not remember some of the items, did not value some because their removal might damage the premises, and did not value others because he thought they were fixtures or built-ins that would have no liquidation value. Community's officer in charge of the Dad's loan was disappointed by Erkelens's appraisal of the

Personal Property but made no effort to compare Erkelens's list of the property he had appraised with Community's own list of the Personal Property or otherwise to reconcile Erkelens's appraisal with the earlier appraisals the bank had obtained.

At trial, the Debtors presented the testimony of another appraiser. This man had acted as a listing agent for Dad's in 1996 for an attempted sale of its real and personal property. At that time, he valued the Personal Property at $135,000 if sold in place. In August 2000, he valued it at $105,000 if sold in place. He did not testify about its liquidation value at either time.

Community finally resold the Dad's real property in August 2000. The buyers were not interested in buying the Personal Property. Relying solely on Erkelens's appraisal, Community decided that removing the Personal Property from the restaurant, paying to repair any damage caused by the removal, and paying a subsequent commission to sell the property would not produce enough additional money to be worth the effort, and so offered to sell the Personal Property to the real property buyers for $1,500. The buyers agreed to buy it for that price.

The Debtors filed their current chapter 13 case in February 2000, and Community filed a proof of claim for over $120,000, partly secured and partly unsecured. Community later filed an amended proof of claim to reduce its claim by the amount of the proceeds of the August sale of the Personal Property. The Debtors filed an adversary proceeding attacking the validity of Community's claim, contending, among other things, that Community's sale of the Personal Property had been commercially unreasonable, so its claim against the Debtors should be unenforceable.

In a summary judgment ruling, the bankruptcy court rejected Community's assertion that the Debtors' unconditional guaranty of Dad's debt had waived any right they otherwise might have had to complain that Community's sale of any of the Dad's collateral had been commercially unreasonable. Following a bench trial, the court determined that Community's sale of the Personal Property had been commercially unreasonable "in virtually every respect." Memorandum Decision at 17, *in* II Appellant's Appendix at 00378. Finally, although the court recognized that Utah Supreme Court had not consistently followed a single approach in determining the effect of a creditor's failure to dispose of its collateral in a commercially reasonable manner, the court concluded it must adopt the approach that absolutely bars the creditor from recovering any deficiency judgment against the debtor because the Utah Supreme Court had "most often, and most recently" adopted that approach. *Id.* Community timely appealed, and neither of the parties objected to our jurisdiction over the appeal.

**Discussion**

■ Community raises four issues on appeal, all concerning questions of Utah state law: (1) Did the Debtors waive their right to object to the commercial reasonableness of Community's sale of the Personal Property by signing guaranties giving Community the right to release its lien on any of its collateral?; (2) Did the bankruptcy court erroneously conclude that Community sold the Personal Property in a manner that was not commercially reasonable?; (3) Even if Community did not sell the Personal Property in a commercially reasonable manner, is Community nevertheless entitled to foreclose on the real property that the Debtors pledged to secure their guaranties?; and (4) Even if Community did not sell the Personal Property in a commercially reasonable manner,

did the bankruptcy court err in ruling that this fact barred Community from recovering anything from the Debtors on their guaranties?[1] These issues all arise under the Utah version of the Uniform Commercial Code ("the UCC") as it existed before Utah adopted Revised Article 9 effective July 1, 2001, and amended other Articles as needed to reflect that substantial change. *See* 2000 Utah Laws, ch. 252, § 177. The events that generated this appeal all occurred before the new Article 9 took effect, and so are governed by the Utah UCC, Utah Code Ann. § 70A–1–101 (1953 & Supp.1999), *et seq.*, as it existed before that date. Consequently, we will refer to the UCC provisions involved in this appeal as "Old" or "Old UCC" Article 3 and Article 9 provisions. We express no opinion about whether the result in this case would be different under the Utah UCC after July 1, 2001.

### 1. Waiver of Commercial Reasonableness

■ Relying on Old UCC § 70A–3–605, Community argues that in their guaranties, the Debtors waived any right to complain about the commercial reasonableness of its disposition of collateral. However, Old Article 3 applied only to "negotiable instruments," Old § 70A–3–102(1), generally referred to in the rest of Old Article 3 simply as "instruments," *see* Old § 70A–3–104(2). Old § 70A–3–605, in turn, applied only to a party who was liable on an "instrument" as an "indorser" or "accommodation party." In order to become either an "indorser" or an "accommodation party," a person ordinarily had to have signed the instrument. *See* Old Article 3

§ 70A–3–204(1), (2) (defining "indorsement" and "indorser"); § 70A–3–419(1) (defining "accommodation party"); § 70A–3–605(1) (for this section, "indorser" included "drawer" covered by another provision); § 70A–3–103(1)(c) (defining "drawer" as one who "signs or is identified in a draft as a person ordering payment"). The Permanent Editorial Board for the Uniform Commercial Code explained it this way:

> A person who agrees to be liable for the debt of another is clearly a surety. If the person effectuates the agreement by becoming a party (i.e., a co-maker or indorser) to the same instrument that creates the obligation, the surety is also an accommodation party. In such a case, the rules in §§ 3–116, 3–305, 3–415, 3–419, and 3–605 concerning accommodation parties are applicable.... If the surety does not effectuate the obligation by becoming a party to the note, the surety is not an accommodation party. In that case, the surety's rights and duties are determined by the general law of suretyship.

Permanent Editorial Board for the UCC, *PEB Commentary on the Uniform Commercial Code, Commentary No. 11*, at 2 (final draft 1994) (citation omitted), *reprinted in* [Findex and PEB Commentaries] UCC Rep. Serv. (West 1998). The promissory note on which Community's claim is based was signed by officers of Dad's, not by either of the Debtors personally. Instead, the Debtors' personal liability to Community is based on their guaranties of the Dad's debt, not directly on the promissory note. Consequently, without

---

**1.** We note in passing that the Debtors suggest several times that we should defer to the bankruptcy court's interpretation of Utah law. While many federal appellate courts used to take this view, the Supreme Court has rejected it and directed appellate courts to reach

their own conclusions about state law legal issues that are properly brought before them. *Salve Regina College v. Russell*, 499 U.S. 225, 231–35, 111 S.Ct. 1217, 113 L.Ed.2d 190 (1991). Consequently, we are required to reach our own conclusions about Utah law.

regard to whether the note would otherwise have qualified as a negotiable instrument, Old § 70A–3–605 did not apply to the Debtors' guaranties of Dad's debt to Community.

Even if Old Article 3 had applied to the Debtors' obligation to Community, Old § 70A–3–605 would not have applied to allow the Debtors to waive their right to require Community to dispose of the Personal Property in a commercially reasonable manner. Although Community recognizes that provisions in Old Article 9 of the Utah UCC, namely Old §§ 70A–9–501(3)(b) and 70A–9–504(3) provided that this right could not be waived, it argues that those provisions were "trumped by the more specific statute, § 70A–3–605." If the provisions were in conflict, though, Old § 70A–3–102(2) provided that the Old Article 9 provisions, not the Old Article 3 provisions, governed.

Utah has not adopted the Official Comments of the UCC. However, the Utah Supreme Court has said, "In interpreting provisions of our Code, we often turn to the official comments of the Uniform Commercial Code for guidance." *Scharf v. BMG Corp.,* 700 P.2d 1068, 1070 (Utah 1985). Official Comment 8 to Old UCC § 3–605 explained that Old § 3–605 and Old § 9–501(3)(b) were not in conflict. The comment stated:

> Subsection (i) [ (7) in the Utah version], however, applies only to a "discharge under this section." The right of an accommodation party to be discharged under Section 3–605(e) [ (5) in the Utah version] because of an impairment of collateral can be waived. But with respect to a note secured by personal property collateral, Article 9 also applies. If an accommodation party is a "debtor" under Section 9–105(1)(d), the accommodation party has rights under Article 9. Under Section 9–501(3)(b)

rights of an Article 9 debtor under Section 9–504(3) and Section 9–505(1), which deal with disposition of collateral, cannot be waived except as provided in Article 9. These Article 9 rights are independent of rights under Section 3–605. Since Section 3–605(i) [ (7) ]is specifically limited to discharge under Section 3–605, a waiver of rights with respect to Section 3–605 has no effect on rights under Article 9. With respect to Article 9 rights, Section 9 501(3)(b) controls.

UCC Revised § 3–605, Official Comment 8, *reprinted in* [1 Code] UCC Rep. Serv. ¶ Rev3605, at 139 (West 2000). Thus, even if the Debtors had a right to be discharged under Old § 3–605 and waived that right, they still had the right under Old § 9–504(3) to insist that Community dispose of the Personal Property in a commercially reasonable manner because Old § 9–501(3)(b) provided that that right could not be waived.

In cases looking to state law under Old Articles 3 and 9 of the UCC to supply a federal rule of decision, the Tenth Circuit had reached conflicting decisions about whether guarantors could waive the right to a commercially reasonable disposition of collateral securing their obligations. *See United States v. Kelley,* 890 F.2d 220, 221–25 (10th Cir.1989) (applying Kansas UCC and holding guarantors could not waive); *United States v. New Mexico Landscaping, Inc.,* 785 F.2d 843, 845–47 (10th Cir. 1986) (assuming New Mexico UCC applied and holding guarantors could waive). Each of the parties suggests we should follow the ruling favorable to their position. However, this case concerns Utah law. As the bankruptcy court pointed out, the Utah Supreme Court had indicated that a guarantor was a "debtor" under Old § 9–504(3) and § 9–105(1)(d). *Haggis Management, Inc. v. Turtle Management, Inc.,* 745 P.2d 442, 444 n. 10 (Utah 1985);

*FMA Financial Corp. v. Pro–Printers,* 590 P.2d 803, 807 (Utah 1979); *Zions First Nat'l Bank v. Hurst,* 570 P.2d 1031, 1033 (Utah 1977). Given this holding, we are convinced that the Utah Supreme Court would further conclude that a guarantor was a "debtor" under Old § 9–501(3)(b) who could not waive the right to a commercially reasonable disposition of collateral.

Community cites several Utah state court decisions to support its argument that the Debtors validly waived the commercially reasonable disposition requirement, but a careful review of the cases reveals that they did not decide whether guarantors can waive their rights under Old § 9–504(3). In three of the cases, the courts did consider the effect or validity of guarantors' waivers of rights, but they did not consider Old §§ 9–501(3)(b) or 9–504(3). *Continental Bank & Trust Co. v. Utah Security Mortgage, Inc.,* 701 P.2d 1095, 1097–99 (Utah 1985); *Seftel v. Capital City Bank,* 767 P.2d 941, 946–48 (Utah Ct.App.1989), *aff'd sub nom. Landes v. Capital City Bank,* 795 P.2d 1127 (Utah 1990); *Walter E. Heller Western Inc. v. U.S. Rock Wool Co., Inc.,* 787 P.2d 898, 899–900 (Utah Ct.App.1988) (applying California law). In the other case, the court noted that guarantors could explicitly waive their rights against collateral under Old UCC § 70A–3–606, but found that the guarantors had not done so. *Valley Bank and Trust Co. v. Rite Way Concrete Forming, Inc.,* 742 P.2d 105, 109–10 (Utah Ct. App.1987). Thus, these cases provide no guidance on the waiver question now before us.

The bankruptcy court correctly concluded that the Debtors did not waive their rights under Old § 9–501(3)(b) and § 9–504(3) to insist that Community's disposition of the Personal Property be done in a commercially reasonable manner.

## 2. Commercial Reasonableness of Community's Sale of the Personal Property

Under Old Article 9 of the Utah UCC, § 70A–9–504(3) provided:

(3) Disposition of the collateral may be by public or private proceedings and may be made by way of one or more contracts. Sale or other disposition may be as a unit or in parcels and at any time and place and on any terms but every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable. Unless collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, reasonable notification of the time and place of any public sale or reasonable notification of the time after which any private sale or other intended disposition is to be made shall be sent by the secured party to the debtor, if he has not signed after default a statement renouncing or modifying his right to notification of sale. In the case of consumer goods no other notification need be sent. In other cases notification shall be sent to any other secured party from whom the secured party has received (before sending his notification to the debtor or before the debtor's renunciation of his rights) written notice of a claim of an interest in the collateral. The secured party may buy at any public sale and if the collateral is of a type customarily sold in a recognized market or is of a type which is the subject of widely distributed standard price quotations he may buy at private sale.

Old 70A–9–504(3). A secured party seeking a deficiency judgment had the burden of establishing that its disposition of collateral was done in a commercially reasonable manner as required by this provision.

*Pioneer Dodge Center, Inc. v. Glaubensklee,* 649 P.2d 28, 29–30 (Utah 1982); *FMA Financial Corp. v. Pro Printers,* 590 P.2d 803, 806–07 (Utah 1979).

> Since the statutory standard of commercial reasonableness cannot be measured with a bright-line test, whether any particular sale is commercially reasonable is to be determined on a case-by-case basis. That determination depends on whether the circumstances of the sale and the manner and business context in which it occurred support a conclusion that the sale was conducted in a commercially reasonable manner.

*Scharf v. BMG Corp.,* 700 P.2d 1068, 1070 (Utah 1985).

The parties dispute the standard of review we must apply to the bankruptcy court's finding that Community's disposition was not commercially reasonable. Ordinarily, we believe, a fact-sensitive determination like the one described in *Scharf* would be a factual finding subject to the clearly erroneous standard of review. On occasion, the Utah Supreme Court has indicated that a lack of advertising or other solicitation of buyers prevents a sale from being commercially reasonable as a matter of law. For example, in *Pioneer Dodge,* the court reversed the lower court's finding that the public sale of a repossessed truck had been commercially reasonable. 649 P.2d at 29–31. The court declared that, "It is fundamental that a public sale presupposes posting public notices or advertising." *Id.* at 30. The creditor (an automobile dealer) had taken the truck to a few other local car dealers and obtained oral bids, placed the truck on its own sales lot for a few days, and then announced over its loudspeaker immediately before beginning that the truck would be sold at auction. *Id.* at 29, 31. In *Haggis Management,* affirming the lower court, the supreme court held that a private sale of a restaurant and private liquor club was commercially unreasonable as a matter of law because the creditor had not advertised or given other public notice that the property was for sale, and had at most contacted only a few potential buyers and received no firm bids before making the sale. 745 P.2d at 444.

Under the *Pioneer Dodge* and *Haggis Management* cases, we believe the bankruptcy court could have found Community's sale of the Personal Property to be commercially unreasonable based solely on its inadequate marketing. As the bankruptcy court said:

> It was uncontroverted at trial that [Community's] only effort to sell the [Personal Property] was by listing it in conjunction with the real property with agents who would receive no commission on the sale—hardly the best exposure if [Community] actually intended to obtain the highest liquidation value for the [Personal Property]. Ultimately, [Community] sold the [Personal Property] to the purchasers of the [real property] who were uninterested in purchasing it. The [Personal Property] was sold "in place, installed, ready to go" for less than 25% of the liquidation value estimated by Erkelens, which estimation took into account only a portion of the [Personal Property]. That [Community] sold the [Personal Property] to an unwilling buyer because it would otherwise incur costs to remove the [Personal Property] simply is not a justifiable excuse for what amounts to giving this property away; instead it is an argument for a more extensive attempt to market the [Personal Property].

Memorandum Decision at 16–17, *in* II Appellant's Appendix at 00377–78. This conclusion was further bolstered by Community's blind reliance on Erkelens's appraisal that, as the bankruptcy court pointed out,

"was curiously out of sync" with at least two other appraisals. *Id.* at 16, *in* II Appellant's Appendix at 00377. Even though Community's officer was disappointed by Erkelens's appraisal, he made no effort to determine whether the appraisal might have been flawed in some way, for example, by omitting some of the Personal Property. Even if the limited marketing did not make the sale commercially unreasonable as a matter of law, we are convinced that the bankruptcy court's finding that the sale of the Personal Property was commercially unreasonable is not clearly erroneous.

### 3. Right to Foreclose on the Debtors' Houses Despite Commercially Unreasonable Sale of Personal Property

■ Community argues that Utah law allows a creditor with a security interest in more than one parcel of real estate to foreclose on all its real estate collateral without regard to the fair market value of any of the parcels. Community relies on *Phillips v. Utah State Credit Union*, 811 P.2d 174 (Utah 1991), a case involving a Utah statute, Utah Code Ann. § 57–1–32 (Supp.2001), that requires a creditor to seek a deficiency judgment against a debtor within three months after the creditor has completed a nonjudicial sale of real property securing the debt. That case is not relevant here, however, because the bankruptcy court's ruling was based on a statute, Old UCC § 9–504, that governed a creditor's disposition of personal property, not real property. The facts in *Phillips* were somewhat similar to those in this case because the creditor had additional collateral besides the real property it had sold, but the Utah Supreme Court's holding was only that the creditor's failure to bring a deficiency action within the three-

month period established by § 57–1–32 did not preclude the creditor from foreclosing on its other collateral; that is, the creditor could foreclose on the other collateral because doing so did not constitute seeking a deficiency judgment within the meaning of the statute. 811 P.2d at 178. The decision says nothing about the effect of a creditor's failure to comply with Old UCC § 9–504, and that is the statute the bankruptcy court based its decision on, not § 57–1–32.

Community further seems to argue that a secured creditor is entitled to foreclose on all its collateral under all circumstances until it is paid in full, no matter what improper actions it might have committed in the course of its foreclosures, and a debtor's rights are limited to suing the creditor for damages after all the collateral has been liquidated.[2] However, Community does not seem to understand that the bankruptcy court's ruling declared, in effect, that Community is not owed any more money. That is why Community cannot foreclose on its remaining collateral. While under the bankruptcy court's ruling, the debt has been extinguished without Community having actually received full payment, the status of the debt is the same as it would be if Community had been paid in full.

### 4. Effect of Commercially Unreasonable Disposition

In the years from 1977 to 1989, the Utah Supreme Court considered commercial reasonableness questions under Old § 9–504(3) in nine decisions. *Cottam v. Heppner*, 777 P.2d 468 (Utah 1989); *IFG Leasing Co. v. Gordon*, 776 P.2d 607 (Utah 1989); *Brigham Truck and Implement Co. v. Fridal*, 746 P.2d 1171 (Utah 1987); *Se-*

---

**2.** It is not completely clear, but we assume that Community is not suggesting that the

creditor can continue to foreclose even after it has recovered the full amount of its debt.

*curity State Bank v. Broadhead,* 734 P.2d 469 (Utah 1987); *Haggis Management, Inc. v. Turtle Management, Inc.,* 745 P.2d 442 (Utah 1985); *Scharf v. BMG Corp.,* 700 P.2d 1068 (Utah 1985); *Pioneer Dodge Center, Inc. v. Glaubensklee,* 649 P.2d 28 (Utah 1982); *Utah Bank & Trust v. Quinn,* 622 P.2d 793 (Utah 1980); *FMA Financial Corp. v. Pro Printers,* 590 P.2d 803 (Utah 1979). It has not considered another in the thirteen years since it decided *Cottam.* In dicta in a footnote in *Cottam,* the court said, "The consequences of a creditor's failure to comply fully with the requirements of section 70A–9–504(3) in disposing of collateral have not been definitively settled in Utah." 777 P.2d at 474 n. 4. The court added that noncompliance with Old § 9–504(3) would not necessarily have precluded the creditor from recovering any deficiency. *Id.* With the complete revision of Article 9, which took effect in Utah on July 1, 2001, it now appears the court will probably never definitively resolve the question of the effect under Old § 9–504(3) of a creditor's failure to dispose of collateral in a commercially reasonable manner. Nevertheless, this appeal requires us to predict what that court would do under the circumstances of this case.

The nine cases can be divided into several categories according to whether the creditor gave to the debtor the required notice of its intended disposition of the collateral, whether the creditor's disposition was commercially reasonable, and whether the creditor obtained a deficiency judgment. Where no notice was given and the disposition was held to be commercially unreasonable, no deficiency judgment was allowed. *Haggis Management,* 745 P.2d at 444; *FMA Financial,* 590 P.2d at 808. Where the notice was slightly defective but caused no harm, but the disposition was otherwise commercially unreasonable, no deficiency judgment was allowed.

*Pioneer Dodge,* 649 P.2d at 31. Where no notice was given or the notice was defective, but the disposition was otherwise commercially reasonable, a deficiency judgment was allowed. *Cottam,* 777 P.2d at 474; *Security State Bank,* 734 P.2d at 472; *Scharf,* 700 P.2d at 1072; *Utah Bank,* 622 P.2d at 796–97. Where adequate notice was given and the sale was commercially reasonable, of course, a deficiency judgment was allowed. *IFG Leasing Co.,* 776 P.2d at 615–16; *Brigham Truck,* 746 P.2d at 1173. In short, without regard to the quality of notice to the debtor, the Utah Supreme Court had always barred a deficiency when the creditor's disposition of collateral was commercially unreasonable, but always allowed a deficiency when the disposition was commercially reasonable. This view would indicate that the bankruptcy court's decision in this case could be affirmed because we are upholding its findings of no notice and commercially unreasonable disposition.

The assertion in *Cottam* that the consequences of errors under Old § 9–504(3) have not been definitively settled in Utah has caused us to consider more thoroughly than we might otherwise have thought necessary whether it was proper for the bankruptcy court to bar a deficiency judgment in this case. Our review of the circumstances of Community's disposition of the Personal Property convinces us that the disposition was at least as egregious as the circumstances that led the Utah Supreme Court to bar deficiency judgments in *Haggis Management, FMA Financial,* and *Pioneer Dodge.* Furthermore, we are not certain that the dicta in *Cottam* meant that the Utah Supreme Court had left open the possibility that a creditor could obtain a deficiency judgment after making a commercially unreasonable disposition. The court might have meant only that it had left open the question of the consequences

of notice errors under Old § 9–504(3). Clearly, its actual holdings all barred a deficiency whenever the creditor made a commercially unreasonable disposition. To the extent the court might have meant to suggest it would not always follow that rule, we believe that we must give more weight to the court's holdings than we do to dicta in a footnote. Under the circumstances of this case, we are convinced that the Utah Supreme Court would affirm the bankruptcy court's decision to bar Community from recovering any deficiency judgment.

### Conclusion

The bankruptcy court's decision is affirmed.