2025 UT App 9

# THE UTAH COURT OF APPEALS

CASCADE COLLECTIONS LLC,
Appellee,
*v.*
ALEX CORRAY,
Appellant.

Opinion
No. 20210896-CA
Filed January 24, 2025

Second District Court, Farmington Department
The Honorable David R. Hamilton
No. 199700598

Chad C. Rasmussen, Attorney for Appellee

Ronald Ady, Attorney for Appellant

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES DAVID N. MORTENSEN and AMY J. OLIVER concurred.

HARRIS, Judge:

¶1     After Alex Corray defaulted on his van payments, the creditor repossessed the van and sold it at auction for an amount less than what Corray owed. Later, Cascade Collections LLC (Cascade), the creditor's assignee, sued Corray to obtain a deficiency judgment. After a trial, the court entered judgment against Corray in the amount of $28,062.45, including principal, interest, costs, a collection fee, and attorney fees.

¶2     Corray now appeals, and he takes issue with the notice of sale that the creditor claims to have sent him. Specifically, he asserts that the creditor never sent the required notice and that, even if it did, the notice was deficient because it did not include any future date after which the creditor intended to dispose of the van. And he asserts that because the creditor's notice was

materially deficient, Cascade is not permitted to obtain a deficiency judgment against him.

¶3    We affirm the trial court's finding that the creditor sent the notice, but we agree with Corray that the notice was statutorily deficient. We also agree that, because the notice was deficient in material ways, Cascade may not obtain a deficiency judgment against Corray. For those reasons, we vacate the court's judgment and remand this matter to the trial court for further proceedings.

## BACKGROUND

¶4    On January 12, 2016, Corray purchased a 2004 Ford Freestar van from an automobile dealer (Dealer). The agreed-upon price of the van was $8,495, but after taxes and fees the out-the-door price was $9,612.75. Corray put only $300 down on the purchase, and he financed the rest of the transaction by borrowing money from Dealer, who assessed Corray a "finance charge" of $3,762.13. The sales contract listed the "total sales price" of the van as $13,374.88.

¶5    Under the financing arrangement, the van was to serve as collateral for the loan that Dealer had extended to Corray, and Corray was obligated to make payments of $143.68 every other week for about forty-five months. The loan agreement gave Dealer the right to repossess and sell the van if Corray defaulted on his obligations, and it allowed Dealer to sue Corray "for any additional amounts owed if the proceeds from a sale of the [van] do not pay all of the amounts due." As part of the transaction, Dealer assigned its rights under the agreement—with Corray's consent—to Paramount Auto Funding LLC (Paramount).

¶6    Between January 2016 and May 2018, Corray made more than fifty payments on the loan, thus reducing the principal balance from $9,612.75 to $3,943.01. On a handful of occasions, when Corray had been late in making a payment, a representative

of Paramount had called him to discuss the matter, and on those occasions Corray "always made the payment by phone" during the call, even though the representative sometimes offered to give Corray "an additional two weeks" to make the payment.

¶7      In late May or early June 2018, Corray missed a payment; he claims that, at the time, he was "incapacitated by . . . a serious illness" and was "so ill [his] phone was turned off." On June 9, not long after the missed payment, Paramount repossessed the van. Corray was aware that Paramount had repossessed the van, because he spoke with the repossession agent when the agent came to take the van and the agent showed Corray "the repo order on his phone."

¶8      After the repossession, Corray claims that he never received any notice from Paramount indicating whether, or when or how, it intended to sell or otherwise dispose of the van. As discussed more fully below, Paramount certainly claims to have sent such a notice. And Corray later testified that, in the days following the repossession, he "tried to contact" Paramount's accounts and finance manager (Manager) on two occasions but was unable to reach her. At any rate, other than—perhaps— receiving the letter Paramount claims to have sent, Corray apparently had no actual communication with Paramount after the repossession.

¶9      On August 30, 2018, the van was sold for $400 at a private dealers-only auction conducted by a reputable and well-known auto auction company. Of the $400 sale price, $150 was sent to Paramount and applied to the outstanding principal balance. Later, Paramount assigned its rights under the loan agreement to Cascade.

¶10     In February 2019, Cascade sued Corray for breach of contract and unjust enrichment, seeking a deficiency judgment for the unpaid principal amount plus interest, collection fees, costs, and attorney fees. Corray filed a pro se answer in which he

asserted several affirmative defenses, including the assertion that Paramount never sent proper notice of the impending sale. But Corray did not file any counterclaims or seek any affirmative relief in the form of damages; specifically, his responsive pleading did not contain any request for statutory damages.

¶11 Later, after Corray retained counsel, the trial court determined, as a matter of law on summary judgment, that Corray had breached the loan agreement, but it reserved all damages issues for trial. And the court denied Corray's competing summary judgment motion in which he had asserted that Paramount had not sent him a notice of sale that included any future sale date, concluding that questions of fact remained for trial on those issues too.

¶12 The court eventually held a one-day bench trial to consider the remaining issues. Three witnesses testified, including Corray and Manager. Although the transcript from her direct examination is not in the record submitted to us, Manager testified on cross-examination that she had "no independent recollection" of mailing Corray a notice of intent to sell. She stated, however, that she was sure such a notice was sent, though she was not entirely sure of the exact date of mailing—her "contact log" indicated that the notice was sent on June 14, 2018, but a "certificate of mailing" with Corray's name and address on it indicated that the notice was sent on June 18.

¶13 The record submitted to us also does not contain an exact copy of the notice Manager testified she sent to Corray in June 2018. But the record does contain an unaddressed form notice that Manager testified was—in substance and other than the missing address—the same one she sent to Corray. That form notice contains a space for the author to input two dates: the date of repossession and the "sale date." Manager testified in a deposition that the "sale date" she entered into Corray's notice was January 12, 2016, the date that Corray purchased the van from

Dealer. And this testimony was corroborated by one of the founders of Paramount, who testified at trial that he agreed that the date listed on the notice as the "sale date" was January 12, 2016, and that the notice sent to Corray did not include any post-repossession date after which Paramount intended to sell or otherwise dispose of the van. Given this evidence, all parties to this appeal agree that the "sale date" listed on any notice sent to Corray was January 12, 2016—the date Corray purchased the van—and that the notice did not include any other sale date.

¶14 In the body of its text, the notice informed Corray that his van had been repossessed, and it stated that Paramount was "interested in discussing with [Corray] how [Paramount] might be able to fix this situation and get [Corray] back into [his] Vehicle and back on track with [his] payments." It invited Corray to contact Paramount to discuss the situation, and it stated that if an agreement could not be reached, then Paramount would "attempt to mitigate the damages [Paramount was] suffering . . . by selling the Vehicle at [a] private sale on or after the sale date listed above." Finally, the notice stated that Corray could "get the Vehicle back at any time before [Paramount sold] it by paying [Paramount] the full amount" owed.

¶15 For his part, Corray testified that he never received any notice from Paramount indicating that it intended to sell or otherwise dispose of the van, but that if he had received such a notice he would have "paid off" the van. He stated that he understood the "payoff amount" to have been about $4,200 and that he "had the funds to" make such a payment at that time. He also testified that he was very interested in doing so because he had made numerous repairs and improvements to the van and had "spent a considerable amount of time and money and effort making sure that [the van] was exactly what [he] wanted."

¶16 About a month after the trial, the court issued a written ruling containing its findings of fact and conclusions of law. As

relevant here, the court found that Paramount had indeed sent Corray a notice of sale letter; in particular, the court found that the notice had been prepared on June 14 and sent on June 18, as reflected in the mailing certificate. The court also found that Paramount had sold the van in a commercially reasonable manner by using a "well-known auto auctioneer in common usage amongst lenders and automobile dealers as the most efficient and effective marketplace."

¶17   With regard to the content of the notice, the court acknowledged that—because Paramount had listed, as the "sale date," the past date on which Corray had purchased the van from Dealer rather than the future date on which Paramount intended to sell the repossessed van—there had been "an error as to the date of sale," but it nevertheless concluded that the notice "satisfies the statutory requirements." The court noted that the statute does not require any "particular phrasing," and it also relied on the fact that a "reasonable time" had elapsed after repossession "before the actual sale . . . took place."

¶18   With regard to damages, the court found that the base damages amount was $3,746.49, but that Cascade was also entitled to recover "interest at the rate of 19.99%," "a collection fee of 35%," costs, and attorney fees. The court later quantified the attorney fees award at $20,459, and it entered a total judgment against Corray in the amount of $28,062.45, plus post-judgment interest "at a rate of 19.990% per annum."

ISSUES AND STANDARDS OF REVIEW

¶19   Corray now appeals, and he asks us to consider three issues. First, he challenges the trial court's factual finding that Paramount actually sent the notice. In this situation, "we review the court's findings of fact for clear error, granting due regard to the opportunity of the trial court to judge the credibility of the witnesses." *Kelly v. Timber Lakes Prop. Owners Ass'n*, 2022 UT App

23, ¶ 23, 507 P.3d 357 (quotation simplified). We will disturb the court's finding only if "the evidence is legally insufficient to support the finding when viewing the evidence in a light most favorable to the court below." *Kidd v. Kidd*, 2014 UT App 26, ¶ 31, 321 P.3d 200 (quotation simplified).

¶20    Second, Corray claims that, if a notice was sent, that notice did not meet Utah's statutory requirements because the date listed on the notice was the past date on which Corray purchased the van, not a future date on or after which Paramount would sell it. And he asserts that, because of the materially deficient notice, Cascade is barred from obtaining a deficiency judgment against him. "This issue presents a question of statutory interpretation and application of that interpretation to undisputed facts, and in this context we review the trial court's determination without deference." *Lerman v. Lerman*, 2024 UT App 155, ¶ 12, 560 P.3d 794; *see also In re J.E.*, 2023 UT App 3, ¶ 14, 524 P.3d 1009 ("This question is one of statutory interpretation, and on such matters we afford no deference to trial courts' decisions.").

¶21    Finally, both parties claim attorney fees. "Whether attorney fees are recoverable in an action is a question of law, which we review for correctness." *Young H2ORE LLC v. J&M Transmission LLC*, 2024 UT App 10, ¶ 26, 543 P.3d 1264 (quotation simplified). However, "when a contract dictates that fees should be awarded to the prevailing party, the question of which party prevailed depends, to a large measure, on the context of each case, and, therefore, it is appropriate to leave this determination to the sound discretion of the trial court." *Id.* (quotation simplified).

ANALYSIS

I. Whether the Notice Was Sent

¶22   Corray first challenges the trial court's factual finding that Paramount sent him a notice indicating that it planned to sell the van. We discern no clear error in the court's finding.

¶23   Under Utah's version of the Uniform Commercial Code, a "secured party" that repossesses collateral is entitled to "sell, lease, license, or otherwise dispose of" that collateral. *See* Utah Code § 70A-9a-610(1). Before it does so, however, that secured party "shall send to" the debtor "a reasonable authenticated notification of disposition." *Id.* § 70A-9a-611(2), (3). In this case, the parties take different positions as to whether any such notification was sent: Corray claims that he never received any such notification, but Paramount claims—supported by Manager's testimony, as well as her "contact log" and a "certificate of mailing"—that it sent such a notice in June 2018, more than two months before the van was sold at auction.

¶24   The trial court, after a bench trial, made a factual finding that a "notice of collateral sale . . . was actually sent" to Corray on or about June 18, 2018, "as reflected on the certificate of mailing." Corray challenges this factual finding as insufficiently supported, pointing out that Manager had no independent memory of mailing the notice, and asserting that Manager was "a poor record keeper" who offered "vacillating, uncertain testimony." He also directs our attention to his own testimony, in which he indicated that he never received such a notice. Corray makes some good points, and these items could potentially have supported a factual finding in his favor about whether the notice was ever sent. But these points are nowhere near enough to meet Corray's burden of demonstrating that the trial court committed clear error in making its finding.

¶25 "A party challenging a trial court's factual finding must do more than merely reargue the evidence supporting his or her position." *Kidd v. Kidd*, 2014 UT App 26, ¶ 34, 321 P.3d 200 (quotation simplified). Instead, that party "must demonstrate that the evidence is legally insufficient to support the finding when viewing the evidence in a light most favorable to" the trial court, and to show legal insufficiency the party must convince us that "the finding is in conflict with the clear weight of the evidence." *Id.* (quotation simplified). "The pill that is hard for many appellants to swallow is that if there is evidence supporting a finding, absent a legal problem—a 'fatal flaw'—with that evidence, the finding will stand, even though there is ample record evidence that would have supported contrary findings." *Kimball v. Kimball*, 2009 UT App 233, ¶ 20 n.5, 217 P.3d 733. In this case, there is plenty of evidence supporting the trial court's finding that Paramount did indeed mail Corray a notice of sale.

¶26 For starters, there is Manager's testimony. To be sure, Corray assails this testimony as unreliable, but the trial court was entitled to credit it, and we note that—although Manager vacillated about *when* she sent the notice—Manager did not ever vacillate about *whether* she sent it. Moreover, her testimony was quite credibly corroborated by documentary evidence, including most notably the certificate of mailing containing Corray's name and address. On this record, sufficient evidence exists to support the trial court's finding.

¶27 Corray resists this conclusion by insisting that Paramount was required to demonstrate "an established mailing custom" indicating that the notice was sent. In support of his argument, he cites *McCoy v. Blue Cross & Blue Shield of Utah*, 1999 UT App 199, 980 P.2d 694, *aff'd*, 2001 UT 31, 20 P.3d 901. But Corray's reliance on this case is misplaced. In that case, the issue was whether a large insurance company had mailed to its insured—McCoy—a copy of a notice of a change in policy terms. *Id.* ¶ 15. The company had apparently "mailed over 30,000 letters" to its insureds

regarding the policy change, but because so many letters were involved, no witness had any direct memory of mailing one to McCoy. *Id.* ¶¶ 15–18. Nor was there any direct documentary evidence so indicating. *Id.* Given the state of the record, the company argued that its "established custom" gave rise to "an inference" that McCoy had been sent a letter. *Id.* ¶¶ 19–20. On the facts of that case, our supreme court rejected the argument that the company had established a mailing "custom." *Id.* ¶ 20. But the court in that case was considering evidence of mailing custom only because there was no direct evidence of mailing. That case does not stand for the proposition that a company *must* establish a mailing "custom" in order to prove that a letter was sent.

¶28    Here, as already noted, there exists ample direct evidence that Paramount mailed Corray a notice of sale. We therefore reject Corray's challenge to the court's factual finding and thus take as a fact—for purposes of the rest of our analysis—that Paramount did send Corray a notice of sale on or about June 18, 2018.

## II. The Contents of the Notice

¶29    Corray's next challenge concerns the contents of the notice. He asserts that even if Paramount sent the notice, its contents do not meet statutory requirements. And he maintains that the consequence of Paramount's failure to send a materially compliant notice is that Cascade—Paramount's assignee—is prohibited from obtaining a deficiency judgment against him. We agree with Corray on both counts.

### A.    Whether the Notice Was Statutorily Deficient

¶30    Utah's commercial code contains certain requirements that govern the content of notices of disposition of collateral, and those requirements vary depending on whether the collateral in question constitutes "consumer goods." *See* Utah Code §§ 70A-9a-613, -614. "Consumer goods" are "goods that are used or bought for use primarily for personal, family, or household purposes." *Id.*

§ 70A-9a-102(23). In this case, the parties agree that Corray's van falls within the definition of "consumer goods." Therefore, the requirements governing disposition of consumer-goods collateral apply here.

¶31    Those requirements are stricter than the requirements governing disposition of other types of collateral. For non-consumer-goods transactions, "the contents of a notification of disposition" are deemed to be "sufficient if the notification" includes—in some form—five things:

- a description of "the debtor and the secured party";

- a description of the collateral;

- a statement describing the "method of intended disposition" of the collateral;

- a statement "that the debtor is entitled to an accounting of the unpaid indebtedness" and that contains "the charge, if any, for an accounting"; and

- a statement setting forth "the time and place of a public disposition or *the time after which any other disposition is to be made*."

*Id.* § 70A-9a-613(1), (3), (4) (emphasis added). While the inclusion of these five items in a notice of disposition concerning a non-consumer-goods transaction will ensure its compliance with statutory requirements, it is theoretically possible—in non-consumer-goods transactions—for a notice that fails to include one or more of these items to nevertheless be deemed compliant. *See id.* § 70A-9a-613(2) ("Whether the contents of a notification that lacks any of the information specified in Subsection (1) are nevertheless sufficient is a question of fact.").

¶32 The situation is different in consumer-goods transactions. Notices of disposition of collateral in those transactions "*must* provide" all five of the items suggested for non-consumer-goods transactions, including—most notably for present purposes—a statement setting forth "the time after which" the creditor intends to dispose of the collateral at a non-public sale. *See id.* §§ 70A-9a-613(1)(e), -614(1)(a) (emphasis added).[1] In addition, such notices must also include information designed to facilitate exercise of the consumer-goods debtor's right of redemption, a right specifically recognized in the commercial code that allows a debtor to regain the repossessed property upon "tender" of "all obligations secured by the collateral" plus "reasonable expenses and attorney's fees." *Id.* § 70A-9a-623(1), (2). A debtor may exercise the right of redemption "at any time before a secured party . . . has disposed of collateral." *Id.* § 70A-9a-623(3)(b). To help facilitate exercise of this right, all notices of disposition in consumer-goods transactions "must" include "a telephone number from which the amount that must be paid to the secured party to redeem the collateral . . . is available." *Id.* § 70A-9a-614(1)(c). And for much the same reason—here, to let consumer-goods debtors know how much time they have to exercise the right of redemption—such notices "must" include notice of "the time after which" the collateral will be sold or otherwise disposed of. *Id.* §§ 70A-9a-613(1)(e), -614(1)(a).

¶33 In this case, Corray contends that the notice Paramount sent him was statutorily deficient because it did not include any

---

1. The full language of the relevant statutory provision requires a creditor to "state the time and place of a public disposition or the time after which any other disposition is to be made." Utah Code § 70A-9a-613(1)(e). Here, however, the parties appear to agree that the van was sold at a private auto auction and not at a "public disposition." Thus, the statutory language that applies here required Paramount to notify Corray of "the time after which any other disposition" of the van was to occur. *See id.*

statement of "the time after which any other disposition [was] to be made" of the van. *See id.* Corray points out that the only date included in the notice was January 12, 2016, the date on which Corray purchased the van from Dealer. And he asserts that this date—which elapsed some two-and-a-half years prior to repossession—cannot qualify as a date or time "after which" Paramount intended to dispose of the van. In particular, he characterizes Paramount's inclusion of the January 2016 date as "egregiously misleading" and contends that, "even if [he] had received that letter, he would not have known the time limits within which he could redeem [the van] before sale."

¶34    In response, Cascade first asserts that it—at least technically—complied with the statute's requirements because January 12, 2016 is a date "after which" it could—and did—dispose of the van. Indeed, it points out that the date the van was sold at auction (August 2018) came "after" the date it listed on the notice (January 2016). We reject this argument, and we hold that the inclusion of a pre-repossession date in the notice cannot satisfy the statutory requirement to include a "time after which" the creditor intends to dispose of repossessed collateral.

¶35    "When we interpret statutes, our primary goal is to give effect to the legislature's intent in light of the purpose the statute was meant to achieve." *State v. Byrum*, 2002 UT 111, ¶ 7, 61 P.3d 1051 (quotation simplified). And in this situation, our supreme court—construing similar language in the current commercial code's predecessor statute—has told us that "[t]he purpose of the notice requirement is *for the protection of the debtor*," because that requirement allows the debtor "to bid at the sale, or arrange for interested parties to bid, and to otherwise assure that the sale is conducted in a commercially reasonable manner." *See FMA Fin. Corp. v. Pro-Printers*, 590 P.2d 803, 807 (Utah 1979) (emphasis added). In this same vein, other courts have recognized that even where, as here, the disposition is to occur at a non-public sale at which the debtor cannot bid, the notice requirement still serves to

protect the debtor, because "it gives the debtor the opportunity to exercise his redemption rights." *See Boender v. Chicago N. Clubhouse Ass'n, Inc.*, 608 N.E.2d 207, 213 (Ill. App. Ct. 1992) (quotation simplified); *accord Wilmington Trust Co. v. Conner*, 415 A.2d 773, 776 (Del. 1980); *Honor State Bank v. Timber Wolf Constr. Co.*, 391 N.W.2d 442, 445 (Mich. Ct. App. 1986); *see also Atlas Thrift Co. v. Horan*, 104 Cal. Rptr. 315, 320 (Ct. App. 1972) (stating that the statutory notice requirement "is essential because without notice the debtor has been denied his right of redemption given him by" the same statutory scheme); *Hartford-Carlisle Sav. Bank v. Shivers*, 566 N.W.2d 877, 882 (Iowa 1997) (listing "to insure . . . [an] opportunity to redeem" as one of the "important purposes" of the statutory notice requirement); *Ford Motor Credit Co. v. Welch*, 2004 VT 94, ¶ 17, 861 A.2d 1126 (stating that the debtor "was entitled to timely notice of the date and time of sale, so that he would have known when his redemption rights would expire").

¶36   These purposes can be readily gleaned from the Utah statute's text. When we interpret statutes, our starting point is, of course, the language the legislature chose. *See Dahl v. Dahl*, 2015 UT 79, ¶ 159, 459 P.3d 276 ("Our starting point is . . . the plain language of the statute."); *see also Marion Energy, Inc. v. KFJ Ranch P'ship*, 2011 UT 50, ¶ 14, 267 P.3d 863 ("The best evidence of the legislature's intent is the plain language of the statute itself." (quotation simplified)). "But we do not interpret statutory text in isolation." *McKitrick v. Gibson*, 2021 UT 48, ¶ 19, 496 P.3d 147. "Instead, we determine the meaning of the text given the relevant context of the statute (including, particularly, the structure and language of the statutory scheme)." *Id.* (quotation simplified); *see also Summit Operating, LLC v. Utah State Tax Comm'n*, 2012 UT 91, ¶ 11, 293 P.3d 369 ("Our statutory interpretation requires that each part or section be construed in connection with every other part or section so as to produce a harmonious whole." (quotation simplified)).

¶37    In this case, the words "time after which" must be interpreted in light of and in harmony with the surrounding and interconnected subsections. *See* Utah Code § 70A-9a-613(1)(e). In particular, one of the other items required to be placed in a notice of disposition of collateral in a consumer-goods transaction is information about "the amount that must be paid to the secured party to redeem the collateral." *Id.* § 70A-9a-614(1)(c). And as already noted, a debtor's right of redemption is an important part of the statutory scheme, and it is the subject of its own commercial code section located just a few sections after the notice provisions. *See id.* § 70A-9a-623. In context, the whole point of requiring creditors to give a date "after which" collateral will be sold at a private sale—one at which debtors cannot appear and bid—is to let the debtors know how much time remains before possible disposition so that they can effectively take steps to exercise their right of redemption or otherwise protect their interests.

¶38    For these reasons, our best reading of the relevant statutory provision—the language requiring creditors to give debtors notice of the date "after which" a private disposition of collateral will occur—is that it contemplates that the debtor will be given notice of some *future* date, after the repossession, after which the creditor intends to sell or otherwise dispose of the collateral. After all, it is chronologically impossible for a creditor to sell or otherwise dispose of collateral before repossession. This interpretation is consistent with the statutory text because it harmonizes all of the relevant sections, including the sections discussing and emphasizing a debtor's right of redemption. This interpretation is also consistent with the sample notice form included in the statute, which uses the future tense ("will sell") and clearly speaks of a sale date that will occur at some point in the future. *See id.* § 70A-9a-614(3) (describing a "sufficient" notice form, including language stating that the creditor "will sell [describe collateral] at private sale sometime after [date]"). And this interpretation even comports with Paramount's own form letter, which used the future tense ("will") several times in

reference to its upcoming plans to dispose of Corray's van. In short, a creditor cannot satisfy the requirement mandating notice of a "time after which" repossessed collateral will be sold by giving a date that predates the repossession itself. From this conclusion, it follows that Paramount's notice—which gave only the January 2016 purchase date—was insufficient.

¶39 The trial court offered two other reasons—neither of which we consider persuasive—for concluding that Paramount's notice "satisfies the statutory requirements." The court acknowledged that the notice contained "an error as to the date of sale," a presumed reference to Paramount's inclusion of the January 2016 date as the "sale date." But it nonetheless saw no problem with the notice, for two reasons. First, the court noted that the statute provides that "[a] particular phrasing of the notification is not required." *Id.* § 70A-9a-614(2). But while this provision may allow for some variation and creativity in the manner in which the statutorily required items are phrased, it does not allow any of the required items to be left out altogether. As discussed already, the problem here isn't one of "phrasing." The variability-in-phrasing provision might, for instance, allow a creditor to say something like "we will dispose of the property in four weeks' time," instead of giving a date, by month and year, after which disposition might occur. But it can't excuse a failure to offer any future date after which disposition will occur. And as we have already determined, offering a date that predates repossession by some two-and-a-half years is not sufficient. A statutory provision allowing variability in phrasing cannot rescue Paramount here.

¶40 Second, the court noted that, despite the "error," Paramount didn't sell the van until August 30, more than two months after it sent the notice. The court then observed that no harm had befallen Corray "because reasonable time was provided before the actual sale that took place." But questions of prejudice and materiality, we think, should be reserved for the next section, when we consider what the consequences ought to be for any

statutory violation; such inquiries do not directly inform the question of whether the statutory requirements were violated in the first place. Indeed, the comments included with the relevant statute state, in no uncertain terms, that "[a] notification that lacks any of the information set forth in paragraph (1)" of section 614 "is insufficient as a matter of law." *See id.* § 70A-9a-614, U.C.C. cmt. 2. And this result makes sense, given the mandatory language of the statute's command: any notice "must" include the "time after which" the creditor intends to dispose of the collateral. *Id.* § 70A-9a-614(1); *see also Utah County v. Butler*, 2008 UT 12, ¶ 28 n.44, 179 P.3d 775 (noting that the word "'must' . . . render[s] a mandatory meaning clear" (quotation simplified)); *Glenn v. Ferrell*, 304 P.2d 380, 382 (Utah 1956) ("The word 'must' is mandatory unless some compelling reason indicating a contrary intent appears."). A notice that does not include this required information is, as a matter of law, statutorily deficient.

¶41 Thus, we conclude that Paramount's notice failed to meet the mandatory requirements of Utah's statute, which requires that Paramount tell Corray "the time after which" it intended to sell or otherwise dispose of the van. Utah Code §§ 70A-9a-613(1)(e), -614(1)(a).[2]

---

2. Cascade also asserts that any deficiencies in the notice it sent Corray are irrelevant because the trial court found that it ultimately sold the van in a "commercially reasonable" manner by using a reputable auto auctioneer. Indeed, Cascade goes so far as to assert that commercial reasonability in the ultimate sale is a "safe harbor" that can serve to cure any defects in the notice. In this context, Cascade's argument is without merit. "Commercial reasonableness and notice are distinct requirements," and "even if the debtor concedes that a commercially reasonable sale was held, a creditor must prove it gave notice to the debtor in its own right." *Boulevard Bank v. Malott*, 397 S.W.3d 458, 467 (Mo. Ct. App.

(continued…)

B.      Consequences of the Statutory Violation

¶42    Next, having determined that Paramount's notice violated Utah statutory requirements, we must consider what the consequences are for that violation. As discussed below, the answer is not readily found in the relevant statutes, nor is it immediately apparent from Utah caselaw. Corray asserts that Paramount's substandard notice operates as an absolute bar to recovery of any deficiency judgment against him. Paramount, for its part, advocates for a no-harm-no-foul approach, and it asks us to consider whether Corray was actually harmed by the problems with the notice and to limit the consequences accordingly. Ultimately, we agree with Corray that the problems with Paramount's notice—which we determine were material—bar Cascade from obtaining a deficiency judgment.

1.      Legal Background

¶43    We begin our analysis by setting forth some necessary legal background. In 1998, the Uniform Commercial Code (UCC) underwent a "substantial revision" that was eventually "adopted in all states." *Uniform Commercial Code*, Unif. L. Comm'n,

---

2013) (quotation simplified); *see also Ruden v. Citizens Bank & Trust Co. of Md.*, 638 A.2d 1225, 1234 (Md. Ct. App. 1994) ("[T]he mere fact that the sale is commercially reasonable in other regards does not adequately atone for the failure to give notice."). This is especially true where the sale occurred at a private auction at which the debtor was not allowed to appear and bid; in such situations, the chief purpose of the notice requirement is to facilitate the exercise of the debtor's right of redemption. A creditor cannot paper over its failure to provide proper notice simply by pointing to a sale that was conducted in by-the-book fashion. Thus, we reject Cascade's claim that, at least in this context, any notice deficiencies were cured by a later sale that the trial court deemed commercially reasonable.

https://www.uniformlaws.org/acts/ucc [https://perma.cc/5CD4-JUMF]. Utah adopted the revised UCC in 2000. *See* Uniform Com. Code – Art. 9 – Secured Transactions, ch. 252, 2000 Utah Laws 866–943.

¶44     Prior to the revision, the Utah statutory section discussing notice stated as follows:

> Unless collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, reasonable notification of the time and place of any public sale or reasonable notification of the time after which any private sale or other intended disposition is to be made shall be sent by the secured party to the debtor.

*Cottam v. Heppner*, 777 P.2d 468, 471 (Utah 1989) (quoting Utah Code § 70A-9-504(3) (1980)). Thus, similar to the current statute, the pre-revision statute—using mandatory language ("shall")—required creditors to give debtors notification of "the time after which" any non-public disposition was to be made of the repossessed collateral.

¶45     The pre-revision statutory scheme gave little guidance as to what the consequences ought to be for a creditor who failed to "comply fully with" statutory requirements governing the "dispos[al] of collateral," and therefore the issue had been left to courts to assess. *See id.* at 474 n.4. In 1989, our supreme court canvassed the relevant caselaw, and it noted "three divergent lines of thought" that had at times been employed by courts, both inside and outside Utah, in determining the consequences to be imposed on a non-compliant creditor. *Id.*

¶46     The first approach is known as the "absolute bar" approach. *Id*. Under this approach, "any failure of a creditor to conform with either the notice or the commercial reasonableness requirements . . . absolutely bars the creditor from obtaining a

deficiency judgment." *Id.* Courts adopting this approach have noted the mandatory nature of notice and commercial reasonability requirements, and they have emphasized the fact that the statutory scheme places the secured party "in such a high degree of control of the relationship" between creditor and debtor, and that it places only "a small burden" on the creditor to achieve statutory compliance. *See Wilmington Trust Co. v. Conner*, 415 A.2d 773, 780 (Del. 1980). And they emphasize that this approach "has the advantage of certainty in a situation in which the lender enjoys a position of domination and control and the consumer-debtor is in a subordinate position in need of the protection the 'absolute bar' rule affords." *Id.* at 781.

¶47 Under the second approach, known as the "setoff" approach, a secured creditor may obtain a deficiency judgment despite noncompliance with statutory requirements, "subject only to a reduction or set-off for damages suffered by the debtor" as a result of the creditor's noncompliance. *See Ruden v. Citizens Bank & Trust Co. of Md.*, 638 A.2d 1225, 1230 (Md. Ct. App. 1994); *see also Cottam*, 777 P.2d at 474 n.4 (stating that, under the "setoff approach, a creditor's failure to comply with the notice or commercial reasonableness requirements . . . does not result in any impairment of its ability to obtain a deficiency judgment; however, that judgment may be reduced by any offsetting damages the counterclaiming debtor is able to prove resulted from the creditor's failure to comply with the section's requirements"). This remedy—both under the pre-revision statute and under the current one—is provided for by statute. *See* Utah Code § 70A-9a-625(2) (stating that "a person is liable for damage in the amount of any loss caused by a failure to comply with this chapter"); *see also FMA Fin. Corp. v. Pro-Printers*, 590 P.2d 803, 807 (Utah 1979) (stating that, under the pre-revision UCC, a debtor had "a right to recover from the secured party any loss caused by a failure to comply with the provisions of this part" (quoting Utah Code § 70A-9-507(1)). But our supreme court has

held that the statutory setoff remedy is not intended to be "the debtor's exclusive remedy." *FMA Fin. Corp.*, 590 P.2d at 807.

¶48 Courts and commentators have noted downsides to these first two approaches. The absolute bar approach "would absolutely bar a creditor from any deficiency judgment, no matter how relatively minor the impact of the noncompliance and no matter how unduly harsh the total bar to a deficiency might be." *See Ruden*, 638 A.2d at 1230. Some courts have therefore seen the absolute bar rule as excessively punitive toward creditors and "repugnant to the spirit of the UCC." *Id.* at 1232 (quotation simplified). On the other hand, under the setoff approach, "the creditor [will] not automatically suffer any sanction at all for his noncompliance." *Id.* at 1230. And the setoff rule places the burden of demonstrating damage—including, in many cases, "establish[ing] the fair market value of the collateral" and then "proving that the fair market value was higher than what the collateral actually sold for at the repossession sale"—entirely on the shoulders of the debtor, who is often ill-positioned to make any such showing. *Id.* at 1230–31 (quotation simplified).

¶49 Largely in light of these criticisms, a third "middle position" emerged in the 1970s and 1980s, one that "softened the harsh bipolarity of the earlier choice" between the two established approaches. *Id.* at 1231. Under that approach—known as the "rebuttable presumption" approach—a creditor's statutory noncompliance "raises a rebuttable presumption that the value of the collateral is equal to the outstanding debt." *See Cottam*, 777 P.2d at 474 n.4; *see also Ruden*, 638 A.2d at 1231 (describing the "presumption that the actual value of the collateral at the time of the wrongful sale is equal to the balance due to the secured party" (quotation simplified)). The burden of rebutting this presumption falls to the secured party, and not to the debtor, an innovation that is thought to provide a "deterrent to an improper sale on the part of the creditor," and thought to adequately "protect[] the debtor's interest, without arbitrarily penalizing the creditor." *Ruden*, 638

A.2d at 1232. Under this approach, if the creditor can prove what the "actual market value" of the collateral is, and can show that the indebtedness exceeds that value, then the creditor is "entitled to a deficiency [judgment] measured by the amount by which the indebtedness exceeds the proven market value." *See Cottam*, 777 P.2d at 474 n.4.

¶50    In 1989, our supreme court examined relevant Utah caselaw and observed that it had "never surveyed the available options and made a reasoned choice from among the [three] alternatives." *Id.* Indeed, it noted that "at various times [it] appear[ed] to have taken each of the three approaches." *Id.* Accordingly, as of 1989 and under the previous statutory regime, our supreme court concluded that any question about consequences for noncompliance with these statutory requirements was "a question that remains open in Utah." *Id.*

¶51    Some thirteen years later, however, one federal appellate court applying Utah law analyzed applicable Utah caselaw, and it discerned a distinction between, on the one hand, our supreme court's treatment of statutory violations of the *notice* requirements and, on the other hand, the court's treatment of statutory violations of other more general *commercial reasonability* requirements. *See In re Kelaidis*, 276 B.R. 266, 275–76 (B.A.P. 10th Cir. 2002). After examining relevant cases, the *Kelaidis* court concluded that the Utah Supreme Court had always applied the absolute bar approach and "barred a deficiency [judgment] when the creditor's disposition of collateral was commercially unreasonable." *Id.* at 275. The court therefore expressed its doubts that—as described in the *Cottam* footnote—there was any open question at all in commercial-unreasonability cases. *See id.* ("[W]e are not certain that the dicta in *Cottam* meant that the Utah Supreme Court had left open the possibility that a creditor could obtain a deficiency judgment after making a commercially unreasonable disposition."). And the court determined to put more stock in the Utah Supreme Court's actual holdings—barring

a deficiency judgment in all commercial-unreasonability cases—than in the court's "dicta in a footnote." *Id.* at 276. Thus, as the *Kelaidis* court saw it, Utah applies an absolute bar in commercial-unreasonability cases, even if the question remained open as to which approach Utah would take in defective-notice cases. *Id.*

¶52     We have independently examined the cases cited and referred to in *Kelaidis*, and in our view the *Kelaidis* court correctly read and categorized Utah Supreme Court pre-revision caselaw. Despite the emerging discussion about the "rebuttable presumption" approach, the pre-revision Utah Supreme Court did indeed bar recovery of a deficiency judgment whenever the disposition of the collateral was deemed commercially unreasonable. *See Haggis Mgmt., Inc. v. Turtle Mgmt., Inc.*, 745 P.2d 442, 444 (Utah 1985); *Pioneer Dodge Center, Inc. v. Glaubensklee*, 649 P.2d 28, 31 (Utah 1982); *FMA Fin. Corp.*, 590 P.2d at 808.

¶53     But based on our review of *Kelaidis* and the cases cited therein, we take the *Cottam* footnote at its word that the answer in defective-notice cases is less clear-cut. On occasion, the Utah Supreme Court applied an absolute bar in cases involving defective notice. *See Haggis Mgmt.*, 745 P.2d at 444; *FMA Fin. Corp.*, 590 P.2d at 808. But in those cases, the court intertwined the notice issues with the commercial reasonability issues, and it is frankly difficult to tell whether the absolute bar was applied due to notice problems, commercial reasonability problems, or some combination of the two. In other cases, by contrast, the court allowed a deficiency judgment despite at least some defect in the notice. *See, e.g., Scharf v. BMG Corp.*, 700 P.2d 1068, 1072 (Utah 1985); *Utah Bank & Trust v. Quinn*, 622 P.2d 793, 796–97 (Utah 1980). But these cases did not involve consumer goods. Thus, our review of the caselaw—as concerns defective-notice cases—leaves us in the same place as *Cottam* and *Kelaidis*: pre-revision Utah caselaw has not definitively answered the question regarding the consequences that should be imposed upon a creditor who provides statutorily deficient collateral-disposition notice to a

consumer-goods debtor. *See Cottam*, 777 P.2d at 474 n.4 (stating that the relevant question "remains open in Utah"); *see also Kelaidis*, 276 B.R. at 276 (stating that the *Cottam* court "might have meant only that it had left open the question of the consequence of notice errors" as opposed to commercial reasonability errors).

¶54 Against this pre-revision legal backdrop, our legislature in 2000 adopted the revised version of the UCC. That new version contains a provision promisingly entitled "Remedies for secured party's failure to comply with chapter." *See* Utah Code § 70A-9a-625. But despite the title, that provision gives little actual guidance, stating only that "a court may order or restrain collection, enforcement, or disposition of collateral on appropriate terms and conditions." *Id.* § 70A-9a-625(1). The next section expressly adopts the "rebuttable presumption" approach, but only in non-consumer-goods cases. *See id.* § 70A-9a-626(1). With regard to consumer-goods cases, the statute has this to say:

> The limitation of the rules in Subsection (1) to transactions other than consumer transactions is intended to leave to the court the determination of the proper rules in consumer transactions. The court may not infer from that limitation the nature of the proper rule in consumer transactions *and may continue to apply established approaches*.

*Id.* § 70A-9a-626(2) (emphasis added). This structure apparently reflected a "compromise reached in the drafting process"—during which "consumer advocates [had] argued that the absolute bar rule should be adopted in consumer transactions"—that served to "limit the statutory application of the rebuttable presumption rule to non-consumer transactions." *See* Marion W. Benfield Jr., *Consumer Provisions in Revised Article 9*, 74 Chi.-Kent L. Rev. 1255, 1266 (1999). The statute left courts "free to apply any of the three existing [approaches], or perhaps a judicially created

variation, to failures of a creditor to comply with the [statutory] foreclosure rules in a consumer transaction." *Id.* at 1267.

¶55 As noted, Utah appears to have had a pre-revision "established approach[]" with regard to cases in which the creditor was found to have disposed of the repossessed property in a commercially unreasonable manner: it applied an absolute bar to recovery of any deficiency judgment. *See Kelaidis*, 276 B.R. at 276; *see also Haggis Mgmt.*, 745 P.2d at 444; *Pioneer Dodge*, 649 P.2d at 31; *FMA Fin. Corp.*, 590 P.2d at 808. But Utah does not appear to have had any pre-revision "established approach[]" with regard to cases in which the creditor's only statutory failure related to the notice it provided the debtor. *See Cottam*, 777 P.2d at 474 n.4; *see also Kelaidis*, 276 B.R. at 275–76. And we are aware of no post-revision Utah appellate court case discussing the issue.

2.  Our Choice of Approach: Absolute Bar, Tempered by a Materiality Requirement

¶56 Thus, we are called upon, in this case, to engage with this open question, and to decide which approach to apply in this situation, in which Paramount provided Corray with a statutorily deficient notice of its intent to dispose of repossessed consumer-goods collateral but in which Paramount apparently later disposed of that collateral in a commercially reasonable manner. Based upon the text of the current statute—which authorizes us to apply "established approaches" from pre-revision caselaw—and our understanding of pre-revision Utah cases, as well as our assessment of the policies served by the various approaches in deficient-notice cases, we conclude that the absolute bar approach should be applied in such cases, at least where (as here) the deficiency in the notice is material.

¶57 We first reject the setoff approach. As noted, the current statute allows a debtor to recover from a creditor—usually in the form of a setoff against any deficiency judgment—any "loss caused by [the creditor's] failure to comply" with statutory notice

requirements. *See* Utah Code § 70A-9a-625(2). Courts applying the setoff approach must necessarily conclude that this statutory remedy is intended to be a debtor's *exclusive* remedy. *See Wilmington Trust Co. v. Conner*, 415 A.2d 773, 778–79 (Del. 1980) (analyzing whether the statutory remedy should "be construed as the exclusive remedy" and therefore whether to follow the setoff approach); *accord Atlas Thrift Co. v. Horan*, 104 Cal. Rptr. 315, 318, 321 (Ct. App. 1972); *see also Hartford-Carlisle Sav. Bank v. Shivers*, 566 N.W.2d 877, 880 (Iowa 1997) (stating that, in deciding whether to follow the setoff approach, "[t]he question is whether [the statutory remedy] is the exclusive remedy"). But our supreme court has already answered this question, and it has concluded that the statutory damages remedy is *not* "the debtor's exclusive remedy." *FMA Fin. Corp. v. Pro-Printers*, 590 P.2d 803, 807 (Utah 1979). Thus, the setoff approach is not appropriate.

¶58   We must therefore decide between the absolute bar approach and the rebuttable presumption approach. And we acknowledge that, in recent decades, the rebuttable presumption approach has apparently gradually become the majority position nationwide. *See Cottam*, 777 P.2d at 474 n.4 (describing the rebuttable presumption approach as "the emerging majority"); *see also* Marion W. Benfield Jr., *Consumer Provisions in Revised Article 9*, 74 Chi.-Kent L. Rev. 1255, 1265–66 (1999) (stating that "[m]ost courts have applied a 'rebuttable presumption' rule"). But the statutory language invites us to apply "established approaches," *see* Utah Code § 70A-9a-626(2), and we are in any event bound by vertical stare decisis to follow the rules and approaches applied by our supreme court, *see Ortega v. Ridgewood Estates*, 2016 UT App 131, ¶ 30, 379 P.3d 18 (stating that the court of appeals is "bound by vertical stare decisis to 'follow strictly' the decisions rendered by the Utah Supreme Court"). And as noted, our supreme court has uniformly applied the absolute bar approach in commercial-unreasonability cases. *See Kelaidis*, 276 B.R. at 276; *see also Haggis Mgmt.*, 745 P.2d at 444; *Pioneer Dodge*, 649 P.2d at 31; *FMA Fin. Corp.*, 590 P.2d at 808. The question presented here

is, therefore, whether that same approach should be followed in deficient-notice cases, or whether a rebuttable presumption approach should be applied in deficient-notice cases even if not in commercial-unreasonability cases.

¶59  As far as we are aware, most states apply the same approach to both types of cases. *See, e.g.*, *Ruden v. Citizens Bank & Trust Co. of Md.*, 638 A.2d 1225, 1229 (Md. Ct. App. 1994) (noting that most courts that follow the absolute bar approach "do so regardless of whether the noncompliance was the failure to give notice or the failure to conduct the sale in a commercially reasonable manner"). Thus, if we were to simply apply the same approach in deficient-notice cases that our supreme court has uniformly applied in commercial-unreasonability cases, we would apply the absolute bar approach.

¶60  A few states make a distinction—in terms of which approach they apply—between deficient-notice cases and commercial-unreasonability cases. *See Ruden*, 638 A.2d at 1233–38; *Holt v. Peoples Bank of Mt. Wash.*, 814 S.W.2d 568, 570–71 (Ky. 1991). But these states deem notice violations to be more egregious—or, at least, less easily compensable with damages—than commercial-reasonability violations, and therefore these states apply the absolute bar approach to notice violations, even while applying the rebuttable presumption approach to commercial-reasonability violations. *See Ruden*, 638 A.2d at 1233–38; *Holt*, 814 S.W.2d at 570–71. It is worth pausing to examine these courts' stated reasons for making such a distinction.

¶61  First and foremost, these courts emphasize that a deficiency in the notice provided to the debtor will often result in "preclusion of the debtor's right of redemption." *See Ruden*, 638 A.2d at 1234; *see id.* at 1235 (stating that "the debtor without notice of the same can be effectively prevented from exercising his right to redemption" (quotation simplified)). Second, and relatedly, these courts also note that a debtor has other options, aside from

redemption, that might be rendered illusory if the debtor receives inadequate notice. *See Holt*, 814 S.W.2d at 571 ("The greatest protection available to debtors from unscrupulous conduct by secured parties who have repossessed collateral is notice of disposition of the collateral."). In this vein, the *Ruden* court stated:

> Furthermore even if the debtor is not in a position to redeem, if he has notice, he may still be able to refinance and must therefore be capable of arranging for potential creditors to inspect the collateral. Alternatively, a debtor with notice may be able to procure interested buyers to drive up the level of competitive bidding. At the very least, notice provides the opportunity to attend the sale to insure that it is commercially reasonable. To permit recovery of a deficiency judgment absent notice would effectively nullify these important debtor's rights and permit a continuation of the evil which the Commercial Code sought to correct.

638 A.2d at 1235 (quotation simplified); *see also Holt*, 814 S.W.2d at 571 ("A secured party who fails to give the notice required . . . denies the debtor an opportunity to assert defenses, contest the amount claimed or pay the indebtedness prior to the sale of the collateral.").

¶62   Moreover, these courts—along with others applying the absolute bar approach more generally—have emphasized that, while a debtor is often subject to demonstrable prejudice when given inadequate notice, the statutory notice requirements placed upon the creditor are relatively easy to comply with. *See Ruden*, 638 A.2d at 1235 (contrasting the "heavy prejudice to a debtor denied notice against the ease with which the creditor may satisfy the notice requirement"); *see also, e.g.*, *Conner*, 415 A.2d at 780 (stating that "[t]he burdens placed on the creditor" with regard to

giving proper notice "are minimal, while the results of his noncompliance may be very onerous to the debtor").

¶63 For these reasons, the few states that make a distinction between notice violations and commercial-reasonability violations have weighed notice violations more heavily. *See Ruden*, 638 A.2d at 1234 (noting a "growing awareness of the qualitative difference between 1) the failure to give the debtor any notice of the sale and 2) other instances of operating in a commercially unreasonable fashion"). In the view of these courts, "[n]otice to the debtor that the collateral is about to be disposed of is so fundamental that no remedy less severe than forfeiture of the deficiency amount would be adequate." *Holt*, 814 S.W.2d at 570; *accord Ruden*, 638 A.2d at 1234. If the ultimate sale is commercially unreasonable, a court can readily determine what a reasonable sale would have looked like and remedy the situation with damages or some sort of setoff. *See Ruden*, 638 A.2d at 1236 (stating that "a debtor may still, of course, be damaged" by a commercially unreasonable sale, but noting that such damage "may be quantified in monetary terms"). In that situation, "[e]quity does not logically require . . . that the debtor be relieved of total responsibility for any deficiency." *Id.* But where the violation in question is a material deficiency in the notice provided to the debtor, these courts have determined that the appropriate remedy is an absolute bar on the creditor's ability to obtain a deficiency judgment. *Id.*; *Holt*, 814 S.W.2d at 571.

¶64 We generally agree with the reasoning of these courts: that *if* a distinction is to be drawn between deficient-notice cases and commercial-unreasonability cases, that distinction should be drawn in favor of applying the absolute bar approach in notice cases and in favor of applying the rebuttable presumption approach in commercial-unreasonability cases, and not the other way around. Thus, regardless of whether we simply apply the absolute bar approach because that's the approach the Utah Supreme Court has historically taken in commercial-

unreasonability cases, or whether we attempt to draw a distinction between the two types of cases, we end up in the same place: any material deficiency in the notice provided by a creditor to a debtor regarding disposition of collateral will preclude the creditor from obtaining a deficiency judgment against the debtor.

¶65 But we caution that the notice deficiency must be material in order for the absolute bar to apply. Some other states that have historically applied the absolute bar rule have created an exception for "a de minimus violation of" the statutory notice requirements. *See, e.g., Hartford-Carlisle Sav. Bank v. Shivers*, 566 N.W.2d 877, 883 (Iowa 1997). Such a safety valve serves to dampen one of the main criticisms of the absolute bar approach, namely, that it "absolutely bar[s] a creditor from any deficiency judgment, no matter how relatively minor the impact of the noncompliance" on the debtor. *See Ruden*, 638 A.2d at 1230. And the Utah Supreme Court has effectively employed this sort of safety valve in the past, once concluding that a notice proclaiming that the collateral would be sold at 11:00 a.m. was adequate, even though the sale actually ended up taking place one hour earlier, at 10:00 a.m. *See Pioneer Dodge Center, Inc. v. Glaubensklee*, 649 P.2d 28, 29 (Utah 1982). Especially in light of the harshness of the absolute bar remedy, we hold that it should not be applied in cases where the deficiency in the notice is minor and thus has no demonstrable effect on a debtor's ability to protect its rights.

¶66 Here, however, the deficiency in the notice Paramount sent to Corray was material as a matter of law. As described already, the notice contained no future post-repossession sale or disposition date after which Paramount intended to dispose of the collateral; instead, as the listed "sale date" the notice recited January 12, 2016, a date two-and-a-half years in the past and on which Corray had originally purchased the van from Dealer. The governing statute requires the creditor to provide the debtor with the future date and time of disposition. *See* Utah Code §§ 70A-9a-613(1)(e), -614(1) (stating that the notice "must" include "the time

after which" a private sale will occur). A notice that does not include this information "is insufficient as a matter of law." *See id.* § 70A-9a-614, U.C.C. cmt. 2. And such a notice materially impairs a debtor's ability to exercise his or her right of redemption, regardless of whether the ultimate sale is public or private, as well as the debtor's ability to investigate and possibly procure refinancing. We have no trouble concluding that entirely omitting the date of any future post-repossession disposition is a statutory violation that cannot be described as de minimis, and is a violation that is material as a matter of law.

¶67 Accordingly, for all of these reasons, Cascade—as Paramount's successor-in-interest—is barred from obtaining a deficiency judgment against Corray, due to Paramount's material violation of the statutory requirements governing notice of disposition of collateral.[3]

### III. Attorney Fees

¶68 Finally, both Cascade and Corray request an award of attorney fees incurred on appeal. The operative contract—the one Corray signed with Dealer—provides that "Buyer" shall be

---

3. Corray also asserts that the trial court erred by not awarding him what he refers to as "statutory damages," that is, damages to compensate him for any "loss caused by [Paramount's] failure to comply with" the statutory notice requirements. But at oral argument before this court, Corray acknowledged that any claim for "statutory damages" was intended to be in the nature of offset and not in the nature of an affirmative claim for relief; indeed, no such affirmative claim was pleaded in Corray's answer to Cascade's complaint. Because we conclude that Cascade is not entitled to recover any judgment against Corray, there is nothing against which Corray could offset any "statutory damages," and therefore Corray's offset claim is moot. We therefore do not discuss it further.

"liable for all costs, attorney fees, and collection fees . . . incurred by Lender in enforcing" the contract. And as Corray correctly points out, Utah's reciprocal attorney fees statute transforms the contract's originally one-sided attorney fees provision into one that would allow Corray to recover fees if he "prevails." *See* Utah Code § 78B-5-826.

¶69    The question of which party has "prevailed" in this litigation overall is one that we review deferentially and one that, therefore, should be decided by the trial court in the first instance. *See Young H2ORE LLC v. J&M Transmission LLC*, 2024 UT App 10, ¶ 26, 543 P.3d 1264 ("When a contract dictates that fees should be awarded to the prevailing party, the question of which party prevailed depends, to a large measure, on the context of each case, and, therefore, it is appropriate to leave this determination to the sound discretion of the trial court." (quotation simplified)). To be sure, Corray prevailed on the main issue presented in this appeal, but he did not prevail on all issues. And we do not possess the same understanding as the trial court does of the entire "context" of the trial court proceedings. *See id.* (quotation simplified). Accordingly, we remand this matter to the trial court so that it can determine, in the first instance, which party qualifies as the prevailing party in this litigation overall, and so that the court can award reasonable attorney fees to that party.

CONCLUSION

¶70    Corray has not demonstrated clear error in the trial court's finding that Paramount sent Corray a notice of disposition of collateral. However, that notice was materially deficient under current statutory requirements, because it did not contain any post-repossession date after which Paramount intended to dispose of the collateral. And we conclude that, as a consequence of the material deficiency of Paramount's notice, Cascade—Paramount's successor-in-interest—may not obtain a deficiency judgment against Corray. On that basis, we vacate the trial court's

judgment, and we remand this case for further proceedings consistent with this opinion, including proceedings regarding the parties' dueling claims for attorney fees.

—————